ROBERT D. CARROLL (*pro hac vice* forthcoming)
*RCarroll@goodwinlaw.com*
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000

MATTHEW R. WISNIEFF (*pro hac vice* forthcoming)
*MWisnieff@goodwinlaw.com*
TIMOTHY KEEGAN (*pro hac vice* forthcoming)
*TKeegan@goodwinlaw.com*
**GOODWIN PROCTER LLP**
620 Eighth Avenue
New York, NY 10018
Tel.: +1 212 813 8800

ISHIKA DESAI (SBN 340239)
*IDesai@goodwinlaw.com*
**GOODWIN PROCTER LLP**
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6000

Attorneys for Plaintiff
OPENEVIDENCE INC.

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| OPENEVIDENCE INC., | Case No.  3:25-cv-5376 |
| Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT, VIOLATION OF THE LANHAM ACT, AND UNFAIR COMPETITION** |
| v. | |
| VERACITY-HEALTH, INC. AND TAIEB BENNANI, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff OpenEvidence Inc. ("OpenEvidence" or "Plaintiff") brings this action for breach of contract, false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition against Defendants Veracity-Health, Inc. ("Vera Health") and Taieb Bennani (collectively, "Defendants").

## INTRODUCTION

1.      This case arises from Vera Health's effort to freeride on OpenEvidence's hard-earned technological advances and pass OpenEvidence's work off as its own.

2.      OpenEvidence has developed the world's leading generative artificial intelligence ("GenAI") platform for medical professionals, aimed at simplifying a healthcare professional's ability to access relevant, evidence-backed medical literature and studies to provide better patient care and outcomes.

3.      The OpenEvidence platform, powered by a carefully-trained large language model ("LLM"), aggregates, synthesizes, and visualizes clinically relevant medical research and evidence in understandable, accessible formats that can be used by physicians, other healthcare professionals, and medical researchers to make more evidence-based decisions.

4.      OpenEvidence has worked hard to develop its technology since it was founded in 2021, and it has succeeded.  OpenEvidence has been referred to as "a life-saving health care revolution" that "could be one of the most important companies of the next decade."[1] It also has been reported that "[a]side from the iPhone, there has never been a piece of technology adopted by doctors as quickly as OpenEvidence."[2]

5.      Vera Health is a small, recently founded start-up.  Yet, on Vera Health's website, the company claims to have done, essentially, what OpenEvidence has done:  create, in its words, "[t]he most powerful AI daily assistant for healthcare professionals."[3]

6.      Vera Health promises an "advanced reasoning engine" that will "cut through the

---

[1] Pat Grady, Sequoia, *Partnering with OpenEvidence: A Life-Saving Healthcare Revolution* (Feb. 19, 2025), https://www.sequoiacap.com/article/partnering-with-openevidence-a-life-saving-healthcare-revolution/.
[2] Sequoia, *OpenEvidence*, https://www.sequoiacap.com/companies/openevidence/.
[3] Vera Health, https://www.vera-health.ai/#platform (last visited June 16, 2025).

1

noise with the latest and most reliable peer-reviewed research, practice guidelines, and medical insights—sourced from a database of 60M+ papers."[4]  And, on top of that all, Vera Health boasts that its platform offers "bank level security" and is  "compliant with HIPAA," so Vera Health encourages the public to use it "for the most sensitive matters."[5]

7.    But Vera Health did not independently build an OpenEvidence competitor.

8.    The reality is that Vera Health built its platform on the back of OpenEvidence's technology and years-long development efforts.

9.    For several months leading up to and following Vera Health's product launch, Defendants—in direct violation of OpenEvidence's terms of service—attacked OpenEvidence's platform by stealing the credentials of and impersonating a licensed healthcare professional, and launched **hundreds** of sophisticated attacks on OpenEvidence's platform in an effort to extract the proprietary training materials used for OpenEvidence's AI model.

10.    The type of attack Defendants initiated—a "model extraction" attack—is a calculated attack on machine learning and AI models aimed at "stealing the parameters or functionality of the confidential model" by repeatedly "querying the confidential model and learning from its responses."[6]

11.    Vera Health did this by asking OpenEvidence's platform over 600 carefully-tailored questions, after improperly obtaining access to the OpenEvidence platform by impersonating an unaffiliated medical provider.

12.    It appears, based on the questions Vera Health promotes in its advertising, which closely mirror the questions that Vera Health asked the OpenEvidence platform, that Vera Health, took the information it improperly obtained from OpenEvidence and fed it to its own LLM to train the Vera Health model on OpenEvidence's work.

---

[4] *Id.*

[5] *Id.*

[6] Minxue Tang *et al.*, Duke University Center of Computational Evolutionary Intelligence, *Model Stealing Attacks*, https://people.duke.edu/~zg70/courses/AML/Lecture14.pdf (last visited June 16, 2025).

13.     Vera Health employed this approach to build its own LLM.  In other words, Vera Health took an unfair shortcut.

14.     Worse, on the Vera Health website and in marketing materials, Vera Health specifically highlights question-and-answer pairings that mirror those Vera Health asked of OpenEvidence's platform—allowing Vera Health to attract users and investors with its tainted outputs.

15.     Not content with the damage done by its attacks and with its tainted product, Vera Health also has falsely and misleadingly promoted its platform, which now competes with OpenEvidence.  Vera Health misleadingly promotes its platform as HIPAA compliant in prominent font, encouraging users to use it "for the most sensitive matters."  But Vera Health's platform is not HIPAA-compliant, only the "enterprise" version of Vera Health is.  That is not indicated to users in Vera Health's (misleading) contention that it is "compliant with HIPAA" and its directive to use the platform for its "most sensitive matters."  Instead, it is separately noted on the Vera Health website that the enterprise version of the platform, but not the main version, is HIPAA-compliant.  This is a serious misrepresentation.  Data privacy is material to consumers, and that is why OpenEvidence— unlike Vera Health—has spent the time and resources to ensure that its platform is HIPAA-compliant across the board.

## NATURE OF THE ACTION

16.     This is an action for breach of contract, violation of the Lanham Act, and unfair competition.

## THE PARTIES

17.     Plaintiff OpenEvidence is a Delaware corporation with a principal place of business in Cambridge, Massachusetts.

18.     Defendant Vera Health is a Delaware corporation with a principal place of business a 2261 Market Street, Suite 22644, San Francisco, California, 94114.

19.     Defendant Taieb Bennani is an individual who, on information and belief, resides in San Francisco, California.  Bennani is a co-founder of Vera Health.  On information and belief, at

all times relevant to this action, Bennani as co-founder and one of the few officers or employees of Vera Health, acted as an agent for Vera Health as well as for his own benefit.

## JURISDICTION AND VENUE

20.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and supplemental jurisdiction over OpenEvidence's state law claims pursuant to 28 U.S.C. § 1367.

21.      This Court has personal jurisdiction over Defendant Vera Health because Vera Health is a corporate defendant residing in San Francisco, California, where it has its principal place of business.  This Court has personal jurisdiction over Defendant Taieb Bennani because Bennani also resides in San Francisco, California.  This Court also has personal jurisdiction over Defendants because the claims against them arise out of Defendants' activities in San Francisco, California.

22.      Venue is proper in this judicial District for all claims under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## FACTUAL BACKGROUND

**A.  The Industry and Attacks on Generative AI Systems**

23.      GenAI, the core technology behind platforms such as ChatGPT, represents one of the newest and most impactful advancements in the rapidly changing field of artificial intelligence. GenAI models are trained on extensive datasets including text, code, images, and other forms of data, enabling them to generate new and original content by identifying relationships and predicting the next elements within a sequence.

24.      LLMs are a subset of GenAI models specifically developed to interpret and understand natural language inputs, or prompts, and to generate human-like text responses.

25.      Once an LLM receives an input, it depends on its training to correctly extract and process the text from the input and provide accurate, reliable responses to the user.  In addition, LLMs utilize instruction fine-tuning, a technique that improves an LLM's ability to understand and respond to human-generated text inputs.

26. Training an LLM requires developers to engineer an entire ecosystem. It is a highly complex and resource-intensive process, involving multiple stages, significant infrastructure, and deep expertise in machine learning, systems engineering, and data management.

27. As a result, training an LLM is an expensive undertaking, with costs ranging from millions to billions of dollars for computing infrastructure, data acquisition and processing, model training and time, and, importantly, human expertise.

28. Because the core functionality of an LLM is to be able to accurately respond to a user's inputs, LLMs are uniquely vulnerable to various cyberattacks aimed at taking advantage of the LLM's training and instructions.

29. One such attack is referred to as "model extraction," in which an attacker recreates or approximates an LLM by interacting with it extensively. The attacker sends numerous inputs and collects the corresponding outputs. Over time, these input-output pairs can be submitted to a new model verbatim in order to train a new model that closely mimics the behavior, performance, or knowledge of the original model.

30. Through model extraction attacks, hackers and other bad actors may be able to, among other things, extract training data, replicate linguistic capabilities, reasoning patterns, and specialized knowledge, copy fine-tuned models trained on private or high-value data, and infer architectural details or training methodologies through output behavior.

31. There are significant repercussions for allowing such attacks to go unchecked. Because LLMs require significant investments in terms of data, computational resources, and human expertise, allowing others to free ride off the work of other developers without incurring any of the initial costs or investment disincentivizes developers from innovating in the GenAI space.

**B. OpenEvidence's Leading Generative AI Platform for Medical Professionals**

32. Medical literature databases, which tend to be outdated in search functionality and natural language integration, collectively hold tens of millions of medical publications.

33. OpenEvidence has developed the world's leading GenAI platform for medical professionals, aimed at simplifying a medical professional's ability to access relevant, evidence-backed medical literature and studies to provide better patient care and outcomes.

34.     The OpenEvidence platform is an LLM extensively trained on medical literature spanning all disciplines, and has been meticulously refined to extract reputable and clinically relevant literature, synthesize and evaluate the latest peer-reviewed studies, summarize key findings, and visualize significant data.

35.     The user-facing OpenEvidence platform employs an LLM-powered chatbot, through which users of the platform can ask natural language medical questions. The LLM then relies on its training to process user input, identify and extract medical literature, evaluate the information for reliability, recency, and relevance, and provide accurate outputs—all in real-time.

36.     OpenEvidence's success is a direct result of its significant investment in the development and training of its LLM. OpenEvidence has been intentional in developing a team of the most talented computer scientists and medical professionals, and enabling that team to develop an advanced LLM trained on a rich and authoritative dataset through extensive research and development.

37.     And through that development, OpenEvidence's LLM has been precisely engineered to retrieve relevant information from continuously updated medical databases, augment the LLM's response with real-time data, and generate natural language responses that are both accurate and contextually relevant. OpenEvidence's training allows its LLM to aid clinicians in their all aspects of patient care.

38.     This success, however, came at significant cost to OpenEvidence, which devoted substantial resources to training its LLM to interpret user inputs, behave and converse in a certain way, and generate thorough and reliable outputs. This training gives OpenEvidence's LLM a significant competitive edge. And OpenEvidence continues to take steps to protect the technology that it gives it that edge.

39.     Specifically, OpenEvidence has invested in protective measures against varying cyberattacks, including enacting recent bans against accounts known to be engaged in such conduct. These protective measures also include encrypting code and prohibiting hacking and other methods designed to unlawfully extract information via OpenEvidence's Terms of Use.

40.     OpenEvidence provides the public with free, but limited, access to its platform. The

general public has the ability to access a less-refined version of the LLM trained on a smaller dataset, and public users can submit two inputs a week.

41.     OpenEvidence's primary userbase—healthcare providers who register an account with OpenEvidence—receive free and unlimited access to its most powerful and sophisticated LLM. To obtain unlimited access to the platform, healthcare providers must register for an account with information including their name, email address, healthcare profession, medical specialty, and National Provider Identifier ("NPI").

42.     An NPI is a unique 10-digit identifier assigned to all healthcare providers in the United States by the Centers for Medicare and Medicaid Services ("CMS").  OpenEvidence ensures that its platform is being accessed by intended users, licensed healthcare providers, by requiring users to provide their NPI.

43.     Once a user registers with their NPI, the user has access to OpenEvidence's cutting-edge platform, and can submit an unlimited number of medical inputs to receive accurate, real-time, and clinically relevant outputs that aid in providing patient care.

44.     All users of OpenEvidence's platform and services agree to be bound by OpenEvidence's Terms of Use, attached hereto as **Exhibit A**.[7]

45.     OpenEvidence's Terms of Use provide: "By using the Services, you agree to these Terms, whether or not you are a registered member of the Company's OpenEvidence Platform" and that "[t]hese Terms govern your use of the Services and create a binding legal agreement that we may enforce against you in the event of a violation."

46.     As a further guardrail to ensure that OpenEvidence is being used by healthcare providers, the Terms of Use also provide that "[t]he Services are intended for physicians and other healthcare professionals.  By using the Services, you represent and warrant that you have the right, authority, and capacity to agree to and abide by these Terms and that you are not prohibited from using the Services or any portion thereof."

47.     OpenEvidence also has a comprehensive set of internal policies and practices that

---

[7] OpenEvidence has recently updated its Terms of Use.  Exhibit A is the operative version of OpenEvidence's Terms of Use at the time of Defendants' misconduct.

robustly protect its data and its confidential, proprietary information. As a condition of employment, all OpenEvidence employees and consultants sign a Proprietary Information and Inventions Agreement, through which employees and consultants agree that they will not "at any time, without the Company's prior written permission, either during or after my employment, disclose any Proprietary Information to anyone of the Company, or use or permit to be used any Proprietary Information for any purpose other than the performance of my duties as an employee of the Company." "Proprietary Information" includes "operational, technological, and scientific information," including software, research and development strategies, designs, methods, inventions, improvements, know-how and trade secrets.

**C. Defendants' Attacks on OpenEvidence's Platform**

48.     Vera Health, a startup in the field of medical AI, markets itself as a platform to streamline the delivery of clinical knowledge through an advanced reasoning engine trained on peer-reviewed research, practice guidelines, and medical insights.

49.     Vera Health launched its platform less than a year ago, in or around September 2024. Despite its recent emergence, Vera Health's platform purports to provide a full range of resources to healthcare professionals, including a GenAI engine sourced from over sixty million papers, clinical guidelines, images and figures, drug information, and a clinical calculator.

50.     Vera Health's accelerated growth has not been fortuitous. To scale at a rapid pace, Vera Health cheated.

51.     Over the course of several months, Defendants, through at least Defendant Bennani, accessed OpenEvidence's platform under false pretenses and engaged in hundreds of attacks on OpenEvidence's platform directed at obtaining some of the most sensitive information to a GenAI company—the underlying training supporting its LLM.

52.     Bennani is not a medical professional and therefore does not possess an NPI, which is a prerequisite to access OpenEvidence's platform.

53.     Bennani, undeterred by OpenEvidence's restrictions on use and determined to circumvent them to gain access to OpenEvidence's platform, identified a way to break into the platform. Defendant Bennani, Vera Health's co-founder, registered for an account with

OpenEvidence using an NPI associated with a real, unaffiliated medical doctor based in Columbia, South Carolina.  By impersonating this medical doctor, Defendant Bennani sought to improperly access the OpenEvidence platform.

54.    But in accessing the platform, Bennani, acting on behalf of Vera Health, expressly agreed to OpenEvidence's Terms of Use (Ex. A), binding Defendants to the restrictions in OpenEvidence's Terms of Use.

55.    The Terms of Use provide, in bolded font: "By using the Services, you agree to these Terms, whether or not you are a registered member of the Company's OpenEvidence Platform" and that "[t]hese Terms govern your use of the Services and create a binding legal agreement that we may enforce against you in the event of a violation."

56.    The Terms of Use further provide, also in bolded font, "[i]f you do not agree to all of these Terms of Use, do not use the Services!"

57.    When Defendants registered for OpenEvidence accounts, they agreed that "[t]he Services are intended for physicians and other healthcare professionals.  By using the Services, you represent and warrant that you have the right, authority, and capacity to agree to and abide by these Terms and that you are not prohibited from using the Services or any portion thereof."

58.    Defendants further agreed "you will provide only accurate and current information through the Content and will not impersonate anyone else in your use of the OpenEvidence Content," will not "[f]orge headers or otherwise manipulate identifiers in order to disguise the origin of any content transmitted through the Services," and will not "[i]mpersonate or misrepresent your affiliation with another person or entity."

59.    Defendants breached the Terms of Use by impersonating a medical professional to impermissibly secure access to OpenEvidence's platform.

60.    Then, Defendants strategically posed hundreds of targeted questions to the OpenEvidence platform over the course of several months to test, evaluate, and ultimately obtain use cases that could be used to train Vera Health's LLM.

61.    Defendants' use cases were wide-ranging in scope, including drug dosage calculations, diagnoses of patients based on varying characters of user input, medical diagnoses

provided in different languages, and medical concepts in fields of pharmacology, cardiology, endocrinology, infectious diseases, ophthalmology, sports medicine, and dermatology.

62.    Defendant Bennani, who is not a medical provider, was—of course—not acting as a medical professional to improve patient care.  Instead, Defendants were submitting sophisticated inputs as part of an effort to obtain OpenEvidence's foundational data and training information.

63.    In the month preceding Vera Health's launch, Defendants peppered OpenEvidence's platform with nearly one hundred questions spanning unrelated medical use cases ranging from drug dosage calculations, diagnoses for patients, and general medical knowledge across fields of oncology, cardiology, dermatology, and internal medicine.  Defendants' queries had limited logical connection to one another, and the volume and variety of inquiries were far from incidental.

64.    Similarly, Defendants actively probed the model for its capacity to perform high-value medical tasks.  Some examples include grant writing, drafting authorization letters, generating budget justifications, visualizing data, and even maintaining board certifications through exposure to exam-style questions.  Through these inputs, Defendants obtained information relating to the OpenEvidence platform's blueprint, which they attempted to replicate for the Vera Health platform.

65.    Defendants also asked questions directed to learning about the robustness of OpenEvidence's model, as they inserted questions with no context and isolated multiple-choice inquiries.  These inputs appear to have been specifically aimed to assess how OpenEvidence responds to abrupt or disruptive deviations from a typical user input to serve Defendants' nefarious purpose of extracting and exploiting these responses to train Vera Health's model.

66.    The above are exemplary and do not represent the full scope of Defendants' model extractions attacks on OpenEvidence's platform, particularly as OpenEvidence is still investigating the scope and impact of Defendants' attacks as of the time of this filing.

67.    In short, Defendants made these queries to harvest data and information relating to the training of OpenEvidence's LLM.

68.    Armed with this information, Defendants appear to have then fed it to Vera Health's LLM in an effort to train the Vera Health LLM to operate at same level of advance and functionality as OpenEvidence's platform.

69.    On information and belief, Defendants used those hundreds of improperly obtained input-output pairings to develop a curated dataset that mimics the behavior of OpenEvidence's LLM, and then used that dataset to train Vera Health's competing platform.

70.    The process of training an LLM using a specified dataset is iterative by design—any developer training an LLM must repeat the exercise at scale with more queries and broader inputs to fine-tune the outputs.  That is what it appears Defendants did with OpenEvidence's platform.

71.    Defendants barraged OpenEvidence's platform with inputs over the course of several months.  Each input was strategically crafted to extract information that could be leveraged to teach Vera Health's model how to cull through an information overload, identify the most relevant and up-to-date clinical research, correct for deficiencies in Vera Health's own AI models, and provide accurate and reliable natural language outputs.

72.    Defendants' intentions in testing countless use cases on OpenEvidence's platform are transparent.   For instance, Defendants queried OpenEvidence's platform to obtain OpenEvidence's output for the "OCT [optical coherence tomography] manifestations of Mactel [macular telangiectasia]."  Vera Health now displays the same input on its own website to show off the advanced capabilities of Vera Health's product:



OpenEvidence's Complaint                                    Case No.

73.    Similarly, Defendants asked OpenEvidence's platform to provide the "[r]ecent changes to HTN guidelines JNC8 vs ACC/AHA."  Vera Health now touts its purported ability to "retrieve information from latest practice guidelines" using a near-identical exemplar:



74.    Though it took years for OpenEvidence to develop and train its LLM to achieve the success it has today, Vera Health did so, on information and belief, within a very short period of time by using OpenEvidence's proprietary training of its LLM.

75.    By engaging in these model extraction attacks, Defendants breached the provisions of the Terms of Use prohibiting them from any "[a]ttempt to circumvent any protective technological measure associated with the Services" and any "[a]ttempt to access or search any [OpenEvidence] properties or any content contained therein through the use of any engine, software, tool, agent, device or mechanism (including scripts, bots, spiders, scraper, crawlers, data mining tools or the like) other than through software generally available through web browsers."

76.    On information and belief, Defendants have used OpenEvidence's input-output pairings to train Vera Health's competing AI platform, which it markets to the same type of healthcare institutions and providers as OpenEvidence, unfairly stealing market share and unjustly enriching Vera Health.

OPENEVIDENCE'S COMPLAINT                                    CASE NO.

77. When OpenEvidence learned of Vera Health's attacks, it took steps to identify and block known Vera Health users from the OpenEvidence platform. The costs for these remediation efforts, in both time and effort, exceeded $5,000.

**D. Defendants' False and Misleading Advertising Compounds Their Wrongdoing**

78. After Defendants improperly leveraged OpenEvidence outputs to train and launch an LLM, they compounded their wrongdoing by falsely and misleadingly promoting the Vera Health platform, which now competes with OpenEvidence's platform in the market for GenAI medical information platforms.

79. Specifically, Vera Health misleadingly promotes its platform as HIPAA-compliant.

80. In reality, though, only a small portion of Vera Health's user queries are covered by HIPAA-compliant protections—those made by its "enterprise" users.

81. This reality—that only a small set of Vera Health queries are protected by HIPAA-compliant protections—is not clear from Vera Health's advertising, which is replete with a stylized "HIPAA COMPLAINT" logo and boasts that the Vera Health platform is "compliant with HIPAA, has "bank level security," and directs to the public to use the platform for its "most sensitive matters":



13

82.     This misleadingly suggests that the Vera Health platform is HIPAA-compliant, but it is not HIPAA-compliant across the board.

83.     Instead, as the Vera Health website makes clear separately, and in less prominent font, only the "enterprise" version of the Vera Health platform is HIPAA-compliant:



84.     Suggesting that the Vera Health platform is HIPAA-compliant across the board when it is not is a serious misrepresentation.

85.     HIPAA compliance is a material consideration for the medical professionals that use platforms such as OpenEvidence and Vera Health.  These medical professionals are bound not to improperly disclose patient health information and data, so whether a medical platform is HIPAA-compliant or not can be dispositive when deciding what platform to use.

86.     As a result, Vera Health's misleading representation that its platform is HIPAA-compliant across the board damages OpenEvidence, which offers a competing platform that is HIPAA-compliant—because OpenEvidence, unlike Vera Health, dedicated the time and resources to build a HIPAA-compliant offering for all of its users.

**FIRST CLAIM FOR RELIEF (against all Defendants)**

**(Breach of Contract – Terms of Use)**

87.     OpenEvidence realleges and incorporates by reference herein each and every allegation set forth above.

88.     OpenEvidence's Terms of Use, attached hereto as Exhibit A, is a valid contract and is in full force and effect.

89.     Defendants agreed to be bound by the terms of the Terms of Use by accepting its terms, which Defendants affirmatively did when they signed up for an account with OpenEvidence.

90.     Specifically, the Terms of Use provide, in bolded font: "By using the Services, you agree to these Terms, whether or not you are a registered member of the Company's OpenEvidence Platform" and that "These Terms govern your use of the Services and create a binding legal agreement that we may enforce against you in the event of a violation."

91.     The Terms of Use then provide, also in bolded font, that "If you do not agree to all of these Terms of Use, do not use the Services!"

92.     The Terms of Use is binding on Defendants with respect to their access to OpenEvidence's platform and systems.

93.     The Terms of Use Provide that "The Services are intended for physicians and other healthcare professionals.  By using the Services, you represent and warrant that you have the right, authority, and capacity to agree to and abide by these Terms and that you are not prohibited from using the Services or any portion thereof."  And under the Terms of Use, Defendants agreed to "provide only accurate and current information through the Content and will not impersonate anyone else in your use of the OpenEvidence Content" and "that your Registration Information is true, accurate, current, and complete, and you will promptly update your Registration Information as necessary so that it continues to be true, accurate, current and complete."  Relatedly, the Terms of Use require users to agree that they will not "Forge headers or otherwise manipulate identifiers in order to disguise the origin of any content transmitted through the Services" and will not "Impersonate or misrepresent your affiliation with another person or entity."

94.     Defendants breached these provisions by falsely providing the NPI credentials of an unaffiliated medical doctor, thereby impersonating that individual to gain access to OpenEvidence's platform.

95.     Defendants, by engaging in the attacks described above, also breached the provisions of the Terms of Use prohibiting them from any "Attempt to circumvent any protective technological measure associated with the Services" and any "Attempt to access or search any [OpenEvidence] properties or any content contained therein through the use of any engine, software, tool, agent, device or mechanism (including scripts, bots, spiders, scraper, crawlers, data mining tools or the like) other than through software generally available through web browsers."

96.     Defendants' breaches are material and caused damage to OpenEvidence.

97.     Defendants are liable to OpenEvidence for breach of contract.

**SECOND CLAIM FOR RELIEF (against Vera Health)**

**(False Advertising, 15 U.S.C. § 1125(a))**

98.     OpenEvidence realleges and incorporates by reference herein each and every allegation set forth above.

99.     Vera Health has made in interstate commerce and, on information and belief, continues to make in interstate commerce false and misleading statements of fact in commercial advertising and promotion, regarding the nature of its technology, which competes with OpenEvidence's technology.

100.    As detailed above, Vera Health has misleadingly represented that is platform is HIPAA-compliant when the platform only is HIPAA-compliant for a small set of "enterprise" users.

101.    Vera Health's statements constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B), § 43(a) of the Lanham Act, because they are, at minimum, misleading.

102.    Vera Health's misleading representations that it is HIPAA-compliant across the board are material in that they are likely to influence consumers' purchasing decisions and because whether or not a medical information platform is HIPAA-compliant or not is a material characteristic users consider before using such a platform and are less likely to use a platform if it is not HIPAA-compliant.

103.    On information and belief, Vera Health's false and/or misleading statements have actually deceived or have the tendency to deceive a substantial segment of its audience.

104.    The false and/or misleading statements above have injured and are likely to further injure OpenEvidence because Vera Health directly competes with OpenEvidence in the medical information platform market.  So, in deceiving users into using Vera Health's platform, Vera Health has depressed demand for OpenEvidence's offerings, leading to declining users, which affects OpenEvidence's advertising revenue.

105.    On information and belief, the statements have, therefore also harmed and continue to harm OpenEvidence's business relationships and goodwill with its actual and potential customers,

1    as they make these customers less likely to continue using OpenEvidence's offering

2    106.    As a result, OpenEvidence has been injured as a direct and proximate result of the

3    wrongful acts of Vera Health alleged above.

4    107.    OpenEvidence has suffered, and will continue to suffer, substantial damage to its

5    business reputation, goodwill, and market share, for which OpenEvidence has no remedy at law.

6    108.    Vera Health's false advertising will continue to OpenEvidence, causing irreparable

7    injury, including unquantifiable damages to OpenEvidence including but not limited to loss of users,

8    loss of short-term and long-term market share, and damages to the goodwill associated with

9    OpenEvidence's business, for which there is no adequate remedy at law, unless permanently

10    enjoined by this Court.

11    109.    Based on the foregoing, OpenEvidence is entitled to enhanced monetary damages of

12    up to three times the amount of OpenEvidence's actual damages and/or Vera Health's profits

13    resulting from Vera Health's false advertising, in an amount to be proven at trial, and the costs of

14    the action, pursuant to 15 U.S.C. § 1117.  OpenEvidence also is entitled to an accounting of Vera

15    Health's profits resulting from its Lanham Act violations.

16    110.    Upon information and belief, Vera Health's false advertising is willful, knowing,

17    calculated to deceive, and was undertaken in bad faith.  Indeed, Vera Health knows that its offering

18    is not HIPAA-compliant across the board, but states so on its website separate from its misleading

19    representations about HIPAA-compliance.  As a result, this Court should determine that this is an

20    exceptional case and award OpenEvidence its attorney fees and costs incurred in prosecuting this

21    action pursuant to 15 U.S.C. § 1117.

22    **THIRD CLAIM FOR RELIEF (against all Defendants)**

23    **(Unfair Competition - Cal. Bus. & Prof. Code § 17200, *et seq.*)**

24    111.    OpenEvidence realleges and incorporates by reference herein each and every

25    allegation set forth above.

26    112.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

27    ("UCL") defines unfair competition to include "any unlawful, unfair, or fraudulent business act or

28    practice."

1    113.    Defendants are "persons" within the meaning of the UCL.

2    114.    Defendants' acts are "unlawful" within the meaning of the UCL, including because

3    Defendants' conduct violates the Lanham Act and OpenEvidence's Terms of Use for the reasons set

4    forth above.

5    115.    Defendants' acts are "unfair" within the meaning of the UCL, including because

6    Defendants' conduct, as detailed above, significantly threatens and harms competition in the market

7    because OpenEvidence and Vera Health are direct competitors, and Defendants are stealing and free

8    riding on the significant investment in and proprietary engineering of OpenEvidence's platform,

9    thus destroying the incentive for OpenEvidence and other medical AI platform developers to invest

10    in innovating within the GenAI industry.

11    116.    Defendants' acts are "fraudulent" within the meaning of the UCL, including because

12    Defendants have impersonated licensed medical professionals to break into OpenEvidence's

13    platform to steal the proprietary training of OpenEvidence's LLM and use it to train Vera Health's

14    platform, and have inaccurately led Vera Health's potential and actual customers and partners to

15    believe that Defendants independently developed the Vera Health platform.

16    117.    Defendants' business acts and practices were targeted at customers and audiences

17    within the State of California, and intended to cause harm within the State of California.

18    118.    OpenEvidence has suffered and will continue to suffer harm as the direct and

19    proximate result of Defendants' unfair acts and practices.

20    119.    Defendants' business acts and practices, as alleged herein, have caused substantial

21    harm to OpenEvidence, including, without limitation, monetary loss from lost business, interference

22    with and damage to OpenEvidence's standing in the marketplace and relationships with actual and

23    potential partners, interference with and damage to OpenEvidence's reputation and goodwill in the

24    industry, attorneys' fees and costs, lost executive time, and other damages.

25    120.    Unless enjoined by this Court, Defendants' ongoing and improper conduct will

26    continue, and OpenEvidence will be further harmed.  Absent injunctive relief, OpenEvidence does

27    not have means to control Defendants' unlawful, unfair, and fraudulent conduct.  Accordingly,

28    pursuant to Cal. Bus. & Prof. Code § 17203, OpenEvidence seeks an order of this Court enjoining

18

Defendants from continuing to engage in the unlawful, unfair, or deceptive business practices set forth herein and any other act prohibited by law.

121. Further, pursuant to Cal. Bus. & Prof. Code § 17203, OpenEvidence seeks restitution in the maximum amount permitted by law and equity.

## **PRAYER FOR RELIEF**

OpenEvidence respectfully requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it the following relief, including but not limited to:

a) A permanent injunction enjoining Defendants from violating OpenEvidence's Terms of Use, engaging in further attempts to gain unauthorized access to and copy OpenEvidence's software, engaging in further false and misleading advertising, marketing and selling any products containing, incorporating, or derived from OpenEvidence's proprietary software, and from using, copying, retaining, or further disclosing any of OpenEvidence's proprietary information;

b) Order Defendants to deliver to OpenEvidence for destruction at Defendants' expense all products, services, and offerings containing, incorporating, or derived from OpenEvidence's proprietary information;

c) Order Defendants to return all proprietary information to OpenEvidence and confirm in writing, verified under the pains and penalties of perjury, that all copies have been destroyed, and outline with specificity exactly what actions were taken by Defendants to ensure the return and destruction of such information, including identifying the files where all such information was located and the custodian of such files;

d) Order Defendants to preserve, and not destroy, and then deliver to OpenEvidence for inspection and analysis, including forensic inspection, all versions of their source code, and related revision history, database schemas, taxonomies, data dictionaries, change logs, differential emails, and internal communications (including on instant messaging platforms such as Slack) to enable OpenEvidence to ascertain the full

OPENEVIDENCE'S COMPLAINT                                                    CASE NO.

extent and scope of Defendants' wrongdoing and ensure appropriate injunctive relief;

e) Order an accounting of all sales of Defendants' products incorporating, using, or derived from OpenEvidence's proprietary information;

f) An award of OpenEvidence's actual damages and Defendants' profits attributable to their violations of law, including—if necessary—through calculation of a reasonable royalty;

g) An award pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117 of up to three times the amount of OpenEvidence's actual monetary damages according to proof, but in no case less than double its damages, exclusive of interest and costs plus prejudgment interest, resulting from Vera Health's false advertising;

h) An award pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, of an accounting of Vera Health's profits resulting from its Lanham Act violations and a disgorgement of those profits in an amount to be proven at trial;

i) An award of unjust enrichment caused by Defendants' wrongful conduct to the extent that it is not addressed in computing damages otherwise;

j) An award of compensatory, consequential, special, exemplary, punitive, and treble damages, including for Defendants' willful, malicious conduct;

k) An Order requiring Defendants to pay OpenEvidence's costs and attorney fees in this action;

l) An award of any applicable prejudgment and post-judgment interest according to law;

m) Order Vera Health to engage, at its own cost, in corrective advertising necessary to correct the false and misleading statements it made about OpenEvidence; and

n) Such other and further relief as the Court may deem appropriate, including without limitation all remedies provided for under any other applicable laws.

OPENEVIDENCE'S COMPLAINT                                      CASE NO.

1

## JURY DEMAND

2          OpenEvidence respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues

3    so triable.

4

5

Dated: June 26, 2025

6

7

                              Respectfully submitted,

8

                              By: */s/ Ishika Desai*

9

10                                ROBERT D. CARROLL (*pro hac vice* forthcoming)
                                  *RCarroll@goodwinlaw.com*

11                                **GOODWIN PROCTER LLP**
                                  100 Northern Avenue

12                                Boston, MA 02210
                                  Tel.: +1 617 570 1000

13

14                                MATTHEW R. WISNIEFF (*pro hac vice* forthcoming)
                                  *MWisnieff@goodwinlaw.com*

15                                TIMOTHY KEEGAN (*pro hac vice* forthcoming)
                                  *TKeegan@goodwinlaw.com*

16                                **GOODWIN PROCTER LLP**
                                  620 Eighth Avenue

17                                New York, NY 10018
                                  Tel.: +1 212 813 8800

18

19                                ISHIKA DESAI (SBN 340239)
                                  *IDesai@goodwinlaw.com*

20                                **GOODWIN PROCTER LLP**
                                  525 Market Street, Floor 32

21                                San Francisco, CA 94105
                                  Tel.: +1 415 733 6000

22

23                                Attorneys for Plaintiff
                                  OPENEVIDENCE INC.

24

25

26

27

28